LE MERIDIEN HOTELS & RESORTS, Nomura International, PLC, Juergen Bartels, and Meridien S.A., Appellants,

v.

LaSALLE HOTEL OPERATING PARTNERSHIP, I, L.P.,
Appellee.

No. 05–03–00910–CV.

Court of Appeals of Texas,
Dallas.

Aug. 30, 2004.

874

David E. Keltner, Jose, Henry, Brantley & Keltner, L.L.P., Fort Worth, Robert F. Henderson, Jackson & Walker, Dallas, for Appellants.

Ben L. Krage, Krage & Janvey, L.L.P., Dallas, William Bosch, Washington, DC, for Appellee.

Before Justices MOSELEY, FITZGERALD, and LANG.

## OPINION

Opinion by Justice FITZGERALD.

Appellants Le Meridien Hotels & Resorts ("LMHR"), Nomura International, plc ("Nomura"), Juergen Bartels, and Mer-idien S.A. ("MSA") (collectively "appellants" or "counterdefendants") were joined in an existing lawsuit by LaSalle Hotel Operating Partnership, I, L.P. ("LaSalle"). They bring this interlocutory appeal challenging the trial court's order denying their special appearances below. For the following reasons, we reverse the trial court's order and render judgment dismissing LaSalle's claims against each of the appellants for lack of jurisdiction.

## BACKGROUND

A lease dispute concerning the hotel formerly operated as the Le Meridien Hotel in Dallas (the "Hotel") underlies this appeal. LaSalle owns the Hotel; during the relevant time, MHI Leasco Dallas, Inc. ("Leasco") leased the Hotel from LaSalle, and Meridien Hotels Inc. ("MHI") operated the Hotel. The lease between LaSalle and Leasco provided that if there were a change in ownership of MHI, then LaSalle could purchase the transferring owner's interest in Leasco for the "fair market value" of that interest. Such a change in ownership did occur when Nomura purchased a number of Meridien properties. LaSalle requested, and MHI and Leasco agreed to a series of extensions before LaSalle ultimately made its election to purchase the leasehold interest. Determination of the fair market value of that interest became the crux of the disagreement among the parties. When that disagreement evolved to litigation, MHI and Leasco took on the role of plaintiffs; LaSalle was cast as defendant.[1]

LaSalle counterclaimed against the plaintiffs, and later—in an amended answer—LaSalle joined LMHR, Nomura, Bartels and MSA as additional defendants in its counterclaims of breach of contract,

1. The parties have informed us that while this appeal was pending, the trial court has dismissed MHI's and Leasco's claims against LaSalle and has realigned the parties. That realignment does not affect the portion of the case before us at this time.

trespass, fraudulent inducement, tortious interference, and conspiracy. None of the four new counterdefendants is a Texas resident: (1) Bartels is a German citizen living in London; (2) LMHR is a British company headquartered in London; (3) MSA is a French corporation headquartered in Paris; and (4) Nomura is a European subsidiary of a Japanese company. LaSalle made the following jurisdictional allegations concerning the counterdefendants:

[LMHR] is a corporation organized and existing under the laws of the United Kingdom, with its principal place of business in London, England. [LMHR] is the parent entity of MHI and directs and controls MHI's management of hotels (including the Hotel) in the U.S.

Nomura is a European subsidiary of Nomura Holdings, Inc., a Japanese company, and has its principal place of business in London, England. Nomura is the "super-parent" entity of [MHI and Leasco] and [LMHR], and does not directly control the day-to-day operations of [MHI and Leasco].

Juergen Bartels is, upon information and belief, a citizen of the United Kingdom and Chief Executive Officer of [LMHR]. Mr. Bartels has significant business contacts with the State of Texas, and in particular with respect to the claims asserted in this action; he has traveled to Dallas, Texas to observe the management of the Hotel and to advise and oversee Meridien's operations.

[MSA] is a corporation organized and existing under the laws of France and is, upon information and belief, an affiliate of [MHI and Leasco]. [MSA] is the owner of several trademarks containing the "Meridien" name. [MSA] has contacts with the State of Texas through operation of the Hotel, business trademarks, trade dress, and other intellectu-al property belonging to and owned by [MSA]. Upon information and belief, [MHI and Leasco] license[ ] the trademark "Meridien" and associated logos from [MSA] for use in hotels it manages in the U.S., and for use in the Hotel herein as well.

* * * *

[MHI's and Leasco's] immediate parent entity, [LMHR], (along with its CEO, Mr. Bartels), and its parent/affiliate MSA are heavily involved in the day-to-day management of the Hotel (one of a handful of Meridien hotels in the U.S.). Mr. Bartels in particular has directed and controlled the actions of the corporate Third–Party Defendants in their dealings with [LaSalle] with respect to the obligations owed to [LaSalle] under the Lease and Management Agreement. In occupying and operating the Hotel, [MHI and Leasco] utilize[ ] trademarks and trade names owned by [MSA]. Thus, [MHI's and Leasco's] affiliate [MSA] is equally involved in both the management and control of [MHI and Leasco], as well as the day-to-day management of [MHI's and Leasco's] business relationship with the Hotel.

This action arises out of ... the conspiratorial conduct of [MHI's and Leasco's] parent entities and affiliates in seeking to deny possession of the Premises to [LaSalle], attempting to interfere with [LaSalle's] business expectations (thereby destroying [LaSalle's] goodwill in the Premises), and by directing [sic] Hotel revenues that otherwise would be available to compensate [LaSalle] for the damages flowing from [MHI's and Leasco's] unlawful conduct.

* * * *

Counter-defendants [MSA, LMHR, and Nomura] have abetted and encour-

aged [MHI's and Leasco's] breach of the Lease, the Management Agreement, and the Assignment Agreement. They have also abetted and encouraged [MHI's and Leasco's] and [LMHR's] tortious interference with [LaSalle's] business expectancy with Westin. They have done so in order to preserve the operation of the Hotel on the [P]remises for as long as possible, regardless of the economic impact or effect that has on [LaSalle], and without regard to [LaSalle's] contractual rights. They have done so in concert with individual Counter–Defendant Bartels, who acted to harm [LaSalle] outside the scope of his official employment duties in furtherance of the conspiracy, out of personal animus against [LaSalle] as well as Starwood/Westin.

Each counterdefendant filed a special appearance that included affidavit testimony. All counterdefendants specially denied having contacts with Texas sufficient to support jurisdiction, denying ownership of a Texas residence, place of business, employees, bank accounts, mailing addresses, telephone numbers, real or tangible property, agents for service of process, or tax liability. All counterdefendants also denied the type of conduct that could support allegations of alter ego in this case. Specifically, the counterdefendants denied any form of day-to-day control over the in-state entities and offered sworn testimony identifying the persons and/or entities that in fact practiced day-to-day control over the in-state entities. They further denied LaSalle's jurisdictional allegations related to filing frivolous lawsuits, making false public statements, and directing the in-state entities to breach any obligation to Lasalle.

The parties conducted discovery on the jurisdiction issue. Following the discovery period, LaSalle filed two responses to the special appearances: one for Bartels and one for the three corporate counterdefendants. The trial court held a hearing on the special appearances. At the hearing LaSalle offered three large exhibits in support of its responses, but the record indicates only the first and third exhibits were admitted into evidence. The second exhibit, which is contained in "Volume 5" of the reporter's record for this appeal, was not admitted into evidence at the hearing or afterward.[2] Despite LaSalle's statement in its brief and at oral argument that it had "walked the court through" the evidence in Volume 5, we cannot consider material that was not admitted into evidence in our review. See Clark v. Noyes, 871 S.W.2d 508, 519 n. 5 (Tex.App.-Dallas 1994, no writ). Accordingly, we will not address evidence contained only in Volume 5 in this opinion.

As to the evidence properly in the record, LaSalle relied on the following contacts in opposing Bartels's special appearance:

- Bartels is the chief executive officer of LMHR.
- Bartels testified that he personally visited the Hotel in Dallas one day in 2002. He spoke with the general manager of the Hotel concerning "the condition of the hotel." That day he also gave a "motivational speech" to the Hotel's employees, as he did at every hotel he visited, at which he talked about the company and its ambitions and telling employees that "when they do good, they do good for Meridien, and when they do bad, they do bad for

---

**2.** Volume 5 of the reporter's record is not numbered by page, and the index to the materials from the hearing indicates it was not admitted into evidence. We have also reviewed the transcript from the hearing and are convinced the trial judge did not admit the materials in this volume.

all of Meridien." Finally, that day Bartels gave "one or two" interviews with individual members of the press, during which he spoke about the company's plans, including plans for marketing and renovation.

● Karyn Marasco, the regional managing director of LMHR for the Americas, testified to conversations she had had with Bartels concerning the Dallas Hotel: one concerning her need to replace the general manager of the Hotel; at least one concerning the impact of new convention centers in America, including in Dallas; and one concerning the Hotel's creativity in hosting a travel-agent party during his visit.

● David Mandefield, the legal director for MSA, testified that he (Mr. Mandefield) attended a meeting at which filing the present litigation was discussed; although he did not recall who was at the meeting, he "suppose[d]" Bartels "must have been" there.

● Bartels testified he was a personal investor in the Nomura acquisition.

● Bartels testified he was unaware of the trademark litigation filed in New York by MHI, Leasco and MSA against LaSalle, but his affidavit opines that the lawsuit was not frivolous and was not filed for any malicious or personal motive, but to protect the "Le Meridien" service mark used by various entities.

As to the corporate counterdefendants, LaSalle relied on the following activities as the basis for asserting jurisdiction over them:

● Ms. Marasco testified that LMHR "has a total responsibility to any hotels falling under the Meridien name and ownership and management and franchise regardless of what the legal enti-

ty of that hotel is." She also testified, when asked to describe the relationship between MHI, Leasco, and LMHR, that "they work in tandem with each other because in many ways they're one and the same."

● Mr. Bartels testified (while answering questions about termination of the lease and the present litigation) that Richard Mahoney (then the chief operating officer of LMHR) was the "leader of the project" and his long-time knowledge of Mahoney was the basis for his belief that action taken by the counterdefendants was justified.

● Mr. Mandefield testified that although he was legal director for MSA, he could advise MHI because it is a "company in the group." He also testified that "on occasion" he discussed legal matters relating to the group with Mr. Bartels.

● MSA is a plaintiff in the New York trademark litigation, which was intended to disrupt and interfere with LaSalle's relationship with the proposed new operator of the Hotel.

● Nomura's purchase of the Meridien chain triggered LaSalle's termination rights relating to the Hotel.

The trial court denied all four special appearances, without making any findings of fact or conclusions of law. The counterdefendants appealed.

## STANDARD OF REVIEW

■ The existence of personal jurisdiction is a conclusion of law that we review de novo. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002). We review the fact findings underlying the trial court's conclusion under typical sufficiency standards. *Id.*[3]

3. When, as in this case, the trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and

## PERSONAL JURISDICTION

The Texas long-arm statute governs the exercise of jurisdiction over nonresident defendants. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (Vernon 1997). Because that statute "reach[es] as far as the federal constitution permits," we focus on the federal constitutional requirements for the exercise of personal jurisdiction. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays*, 815 S.W.2d 223, 226 (Tex.1991); *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex.1990). Under federal due process requirements, we determine (i) whether the nonresident defendant has purposefully established "minimum contacts" with the forum state, and (ii) if so, whether the exercise of jurisdiction comports with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

Establishing "minimum contacts" for jurisdictional purposes requires a substantial connection between the nonresident defendant and Texas, arising from action or conduct by the nonresident defendant that is purposefully directed toward Texas. *Guardian Royal*, 815 S.W.2d at 230. Minimum contacts requires "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp.*, 471 U.S. at 475, 105 S.Ct. 2174.

Under the minimum contacts analysis, personal jurisdiction may be either general or specific. *Schlobohm*, 784 S.W.2d at 358; *Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 632 (Tex. App.-Dallas 1993, writ denied). Specific

jurisdiction is invoked when the cause of action pleaded arises out of or relates to the nonresident defendant's contacts with Texas. *Guardian Royal*, 815 S.W.2d at 228. General jurisdiction requires a showing of continuous and systematic contacts between the nonresident defendant and Texas. *Id.* Our analysis focuses on the relationship among the appellants, the forum, and the litigation. *Schlobohm*, 784 S.W.2d at 357. For LaSalle to prevail, the actions of the nonresident counterdefendants must justify a conclusion that they should have reasonably anticipated being called into court in the forum state. *See Temperature Sys., Inc. v. Bill Pepper, Inc.*, 854 S.W.2d 669, 675 (Tex.App.-Dallas 1993, writ dism'd by agr.).

As a rule, the nonresident carries the burden of negating all bases for personal jurisdiction. *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex.1985). One exception to that rule arises when the claimant asserts that personal jurisdiction exists based on an alterego theory. In that case, the claimant argues that a resident corporation's contacts with the forum may be imputed to a nonresident affiliated corporation. But Texas law allows the nonresident corporation to rely upon the Texas presumption of corporate separateness. Accordingly, the claimant must prove the nonresident corporation is actually the alter ego of the resident corporation. *BMC Software*, 83 S.W.3d at 798.

In this case, LaSalle's allegations of personal jurisdiction are based on two theories: (1) Texas courts have specific jurisdiction over all counterdefendants because they committed a tort "directed at" this forum, and (2) Texas courts have general

supported by the evidence are implied. *Id.* at 795. Because our record includes the reporter's and clerk's records, the implied findings

are not conclusive and may be challenged for legal and factual sufficiency in this Court. *Id.*

jurisdiction over the three corporate counterdefendants because they are actually the alter egos of original defendants MHI and Leasco.

## COMMISSION OF A TORT

■■■■ A nonresident who commits a tort in whole or in part in this State will be deemed to have done business in the State and will, as a result, be amenable to jurisdiction in the courts of the State. *See* TEX. CIV. PRAC. & REM.CODE. § 17.042(2). However, causing an injury in Texas cannot, in and of itself, establish minimum contacts sufficient to establish personal jurisdiction. *City of Riverview, Mich. v. Am. Factors, Inc.,* 77 S.W.3d 855, 858 (Tex.App.-Dallas 2002, no pet.). Instead, to support personal jurisdiction, the defendant's activities must be "purposefully directed" at the forum. *Id.* LaSalle alleged in its pleading that the four counterdefendants had committed the tort of interference with prospective contractual relations and that their tortious actions were either committed in Texas or were "directed at" Texas.[4] The counterdefendants bore the burden of negating these allegations at the special-appearance stage of the litigation. *See BMC Software,* 83 S.W.3d at 793. Thus, the counterdefendants were required to disprove the existence of contacts with Texas that gave rise to LaSalle's alleged injuries, which in turn gave rise to this litigation. *See Guardian Royal,* 815 S.W.2d at 228 (specific jurisdiction requires nonresident defendant's activities be purposefully directed to forum, and litigation must result from alleged injuries that arise out of or relate to activities).

### Bartels

■■■ LaSalle contends that Bartels was directing appellants' plan to breach the lease and to disrupt the relationship of LaSalle and the prospective new operator of the Hotel. LaSalle's tortious-interference allegations against Bartels are really twofold: (1) that his visit to Dallas in 2002 must have related to some degree to the ongoing litigation over the termination of the Hotel lease, and (2) Bartels must have had a "relationship" with the filing of the New York trademark action. Bartels has specifically denied both of these allegations. He testified that his trip to Dallas included the very same activities he was conducting at all of the Le Meridien hotels and was not related to this litigation in any way. Indeed, the evidence concerning the substance of Bartels's trip to Dallas is uncontradicted: it establishes that the trip was wholly unrelated to the Hotel lease, its termination, or the current litigation. We find no evidence in the record that contradicts Bartels's denial on this point. Similarly, we find no evidence in the record contradicting Bartels's denial of involve-

---

**4.** The tort of interference with prospective contractual relations requires proof of four elements:

(1) a reasonable probability that the parties would have entered into a contractual relationship;

(2) an "independently tortious or unlawful" act by the defendant that prevented the relationship from occurring;

(3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and

(4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*Allied Capital Corp. v. Cravens,* 67 S.W.3d 486, 491 (Tex.App.-Corpus Christi 2002, no pet.).

LaSalle's petition also alleged a conspiracy to interfere with LaSalle's prospective contractual relations. However, LaSalle has made clear that it does not depend on the conspiracy allegations for jurisdictional purposes.

ment in the New York litigation. La-Salle's argument to the contrary on these points is based on sheer speculation. We conclude Bartels has negated LaSalle's allegations that he has contacts with Texas, based on his single trip to Texas or any tortious activities purposefully directed at the State, sufficient to support specific jurisdiction in this case.

### The Corporate Counterdefendants

 LaSalle also argues that specific jurisdiction is appropriately exercised over the corporate counterdefendants. First, LaSalle argues that LMHR (1) authorized the initial lease for the Hotel, (2) sent the notice of the change in ownership that triggered the lease dispute, and (3) "was involved in directing the litigation conduct" of Leasco. LMHR need not negate the first two allegations: neither can possibly be seen as evidence of tortious conduct.[5] As to directing Leasco's "litigation conduct," it is true that Mr. Bartels testified that the chief operating officer of LMHR oversaw the litigation, but we cannot equate one company's oversight of existing litigation against its subsidiary with that parent company's involvement in the *substance* of the litigation. LMHR specifically denied taking "any actions at all with respect to the [l]ease or the Hotel," and LMHR specifically denied encouraging or directing any breach of obligations to La-Salle. We find no evidence to the contrary in the record.

 As to MSA, LaSalle's specific-jurisdiction allegations focus upon the filing of the New York trademark case. Mr. Mandefield, MSA's affiant, denied the charge that the New York suit was frivo-lous, and his affidavit explains how the litigation was filed to protect the Meridien marks. We find no evidence in the record indicating the New York court deemed the suit frivolous. LaSalle's unsubstantiated charges are not evidence.

 Finally, LaSalle alleges specific jurisdiction is appropriate as to Nomura because it purportedly reviewed and approved letter extension agreements "through which the Meridien Group fraudulently procured LaSalle's forbearance in exercising its termination rights." In support of this allegation, LaSalle cites to the deposition of Robert White. However, the pages cited do not speak to anything like Nomura's "fraudulently procur[ing] La-Salle's forbearance." Instead, the pages cited speak to "Meridien"[6] acceding to LaSalle's request to have other hotel operators tour the Hotel. Nomura's affidavit states that it has no management authority with respect to the "Meridien entities" in which it holds "a certain economic interest." We find no evidence in the record that identifies any conduct of Nomura that relates to the subject of this litigation in any way.

We conclude that each of the counterdefendants successfully negated the specific-jurisdiction allegations made by Lasalle. We conclude appellants lack minimum contacts that would justify a Texas court exercising specific jurisdiction over them. Given this resolution, we need not address the issue of fair play and substantial justice. *See Zamarron v. Shinko Wire Co., Ltd.,* 125 S.W.3d 132, 145 n. 9 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).

---

5. Nevertheless, we note that Lisa MacKenzie, LMHR's affiant, does deny that LMHR participated in "negotiating, executing or performing" the lease.

6. The deposition excerpt provided does not make clear which Meridien entity or groups of entities are being discussed here. For purposes of this narrow issue, the identity of the actor is not significant.

## ALTER EGO

Alternatively, LaSalle alleges that the counterdefendants are mere alter egos of the original counterdefendants and, as a result, the court has general jurisdiction over the newly joined parties. Texas courts may exercise personal jurisdiction over a nonresident defendant if that defendant's relationship with its resident subsidiary "would allow the court to impute the subsidiary's 'doing business' to the parent corporation." *Id.* at 141; *see also BMC Software,* 83 S.W.3d at 798 (stating same principle in converse terms, i.e., imputing parent's "doing business" to nonresident subsidiary). Because LaSalle seeks to disregard the presumed corporate separateness of the entities at issue in this case, it bears the burden of establishing a relationship between or among those entities that would justify doing so. *See Zamarron,* 125 S.W.3d at 141.

It is undisputed that these counterdefendants are corporately related to the resident entities: Bartels acknowledges he is chief executive officer of LMHR, which in turn acknowledges being a "remote parent" of MHI. MSA likewise concedes it may be considered a parent company of MHI. And Nomura characterizes itself as a "financial institution" that is "a remote holder of a certain economic interest in certain Meridien entities." However, the mere existence of a parent-subsidiary relationship will not justify the disregard of the corporate fiction and exercise of jurisdiction over the nonresident parent. *Id.* Instead, to disregard the corporate separateness of parent and subsidiary for jurisdictional purposes, the plaintiff (here, the third-party plaintiff) "must prove the parent controls the internal business and affairs of the subsidiary." *BMC Software,* 83 S.W.3d at 799. In that situation, the court can impute the subsidiary's contacts to the nonresident parent, because:

> the parent corporation exerts such domination and control over its subsidiary that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.

*Id.* at 798 (internal quotations omitted). "One hundred percent stock ownership, commonality of officers and directors, and an exercise of control derived from stock ownership are not sufficient to establish an alter ego relationship." *Zamarron,* 125 S.W.3d at 142. Indeed, even proof of complete authority over general policy decisions of the subsidiary will not establish alter ego unless the parent also controls the daily operations of the subsidiary.[7] *See id.* Accordingly, for LaSalle to establish personal jurisdiction based on alter ego, it must have established that the corporate counterdefendants exercise control over the day-to-day operations of MHI and Leasco.[8]

Initially, we reject LaSalle's alter ego theory as to Nomura. LaSalle's own pleading asserts that Nomura "does not directly control the day-to-day operations of [MHI and Leasco]." Thus, LaSalle's own jurisdictional allegations negate the possibility that Nomura can be the alter ego of these entities for jurisdictional purposes.

As to LMHR, LaSalle established that Bartels is LMHR's CEO, and Mandefield serves as general counsel for the

---

7. Accordingly, a parent company's establishment of corporate business plans cannot be a sufficient basis for alter-ego-based jurisdiction.

8. LaSalle does not argue on appeal that individual counterdefendant Bartels is an alter ego of either MHI or Leasco.

whole "group" despite being employed by MSA. And as to MSA, LaSalle established that MSA enforces trademarks used by all "Meridien Group hotels." It was MSA, LaSalle posits, that decided to file the New York trademark litigation suit. LaSalle's evidence points out some links or connections between these related companies, including examples of overlapping officers, employees, and administrative services. However, the connections typical of a mere parent-subsidiary relationship will not justify the disregard of the corporate fiction.[9] *See Zamarron*, 125 S.W.3d at 141. Nor will the existence of common officers or directors or employees be sufficient. *Id.* at 142. We conclude LaSalle's evidence falls far short of establishing that any of the corporate appellants controls the daily operations of MHI or Leasco.

 Finally, the special appearance record does not identify or evidence any fraud or injustice that could result from a failure to treat these entities as the alter egos of the resident parties. LaSalle argues the fraud-or-injustice requirement is not relevant to an alter ego analysis for jurisdictional purposes. We disagree. The supreme court specifically included this requirement in its statement of the standard to be met by the claimant seeking to "fuse" parent and subsidiary companies for jurisdictional purposes:

> But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate *so that the corporate fiction should be disregarded to prevent fraud and injustice.*

*BMC Software*, 83 S.W.3d at 799 (emphasis added).

---

9. We give little weight to the out-of-context statement by a witness describing relevant entities as being "in many ways … one and the same," when that witness clearly and

We conclude LaSalle's alter-ego theory does not provide a basis for exercise of personal jurisdiction over these nonresident appellants.

### CONCLUSION

Appellants lack minimum contacts with the State of Texas indicating they have "done business" here within the meaning of the long-arm statute. None of the specially appearing corporate counterdefendants are alter egos of the resident corporations. Accordingly, we conclude that none of these appellants should reasonably have anticipated being called into court in Texas, and we conclude there is no basis for exercising personal jurisdiction over them. We reverse the trial court's order denying the special appearances, and we render judgment dismissing LaSalle's claims against each of the appellants for want of personal jurisdiction.

---

repeatedly states she has no knowledge or understanding of any corporate relationships or entities involved.